210-0147, Law Aerosol and Specialty v. Daly Good morning, Honorable Members of the Court and Mr. Beers. And I please the Court, my name is Robert Newman. I'm present for the appellant, Ball Aerosol and Specialty Containers, formerly known as U.S. Can Company. The business that brings us before the Court today is a claim for an allergic contact dermatitis, a claim being brought on behalf of Don Daly. Don Daly, the claimant worked for U.S. Can Company from 1994 to 1996 as a pallet sorter. Then from 1996 to 19, excuse me, 1996 to 2001, an aerosol press operator. This is a plant where they make cans for spray paints or cans for gasoline or various kinds of metal cans. So as an aerosol press operator, she was stamping out the parts that would be made into cans, typically the end parts out of metal. Then in 2001 to 2002, she worked as a janitor most of the time and a metal press or aerosol press operator occasionally. She opted to be a janitor because she could be on first shift, she said. Now, this lady, Ms. Daly, she did develop some allergies which caused a rash that was manifest mainly or most severely on March 14th of 2002 when she went to the Law Office of Brady and Johnson. I had some pictures taken that were admitted into evidence. The rash developed mostly on the face and to a lesser extent on the arms below the elbow. So she develops the rash or it gets worse while she's working for your client. Why doesn't she recover? Why doesn't she? Why is she excluded from recovery? Well, the reason why is that it's really not an occupational rash, as it turns out. The petitioner, it turns out, once she was patch tested, was allergic to formaldehyde, which is present in 50% of makeup formulations. Now, the petitioner testified in her testimony on cross-examination that at the time she had the outbreak, she had it first around the eyes and she was using eye makeup. So the evidence is that she was using eye makeup directly and applying it directly to the area where she had the outbreak. Furthermore, it turns out that she's allergic to a chemical that's used as preservative in eye drops. And when she developed the rash around her eyes, she used these eye drops to try and control the symptoms. But actually that made the dermatitis worse. So what she's got really is a dermatitis due to the substances that she's using that the job doesn't require her to use. She's using makeup. She's using the eye drops. Those are personal products that she uses. And her condition improved on weekends when she was away from the job site. Less makeup on weekends. She's not going out in public. So your opinion, your argument is that the job, the exposure to these emitted chemicals, had nothing to do with her condition. Right. Because her testimony was that it worked. She wore safety glasses or prescription glasses, depending on exactly which task she was doing. But she wore glasses to limit any kind of exposure of substances around her eyes. She wore a mask, a paper filter mask as a janitor to prevent any contact of things with her mouth. She wore gloves. She wore different types of rubber gloves depending on the task involved. But she had really sturdy metal, excuse me, really sturdy rubber gloves to use during cleaning of like toilets and things like that that required using a harsher chemical. She had latex gloves to use other times. So basically the point is that in doing her occupational tasks, she wore these protective garbs to prevent her from actually having skin contact with substances in the workplace. Contrast that to her deliberately placing directly onto her skin substances to which she was allergic for the purpose of makeup. She was using gold jewelry in her earlobes. And gold turns out to be one of the substances she's allergic to also. Now, they don't use gold to make cans, but it is in the jewelry that she was using. What about Dr. Sheiman's testimony that she was most allergic to the same substances that she was exposed to at work? Metal, metal dust, fragrance, cleaning products, those items. What about that testimony? Well, it was a report, not testimony, but that really doesn't make much difference because it's admitted. He did say that she had positive patch testing to these, to some of the things that she might have been exposed to at work. Because he was kind of making guesses, by the way, as to what fragrance chemicals were present in the janitorial products. With regard to the metal products, he was also making guesses. Turned out that the claimant, Ms. Daly, was allergic to gold, cobalt, and nickel. Now, nickel, it turns out, by the report of Blum, is present only to the extent of 0.15%. That's less than a sixth of 1% in the substrate of some kinds of cans. So there's actually very little nickel used in this environment. Dr. Well, let's take your argument here that, okay, she has some products that's her personal hygiene, whatever, is a primary cause of her condition. And she has a second exposure to some of these items at work. Why can't she recover under the law, under those circumstances? The problem with the question, my response to the question, is that the claimant testifies she actually didn't have physical skin contact with this substance at work. She testified that she wore protective garb, so she wouldn't have skin contact with these substances at work. And she was... Was she wearing a mask at all times? Was she wearing a hazmat suit? She wore a paper mask that fit over the nose, mouth, chin, and cheeks. She wore protective glasses. She wore an apron. She wore protective gloves. So, yes, she was covered over the areas where she... The argument is it's impossible for her to have any exposure to these items. You should win on that basis, right? If it's impossible, we should win on that basis, yes. And the other point is that if it's on a... The petitioner testified that she was careful, she was diligent, and she did not have skin contact with these substances at work. That's the missing link, I believe, in the claimant's claim for an occupational disease. Because she didn't really explain how she had skin contact with these substances at work. She just kind of asked the arbitrator and the commission and the lower court to assume that because some of these substances could or might have been present at the workplace in small concentrations, that was the reason why she had these rashes. What about the cleaning agents at work that have fragrance-type cleaning agents? That's not something that she was supposed to protect against, was it? Well, again, it's supposed to be skin contact. It's not a respiratory inhalation case. It's a skin contact dermatitis. So for her to have a skin contact dermatitis, she's got to have some skin contact. And with these cleaning agents that she used as a janitor, she testified that she diligently and successfully used barrier agents, the gloves, the aprons, the masks, the safety glasses, to avoid skin contact. What would be your argument if there was a finding that there was a combination of her personal activities or exposures at home on the weekends and some type of exposure at work as well? What happens then? Well, if you think that it's a combined effect, then the claimant recovers. But that's what I'm arguing, that it's not a combined effect. Well, you have to, because you're right. Under the law, you've acknowledged passively that the claimant would recover, because the exposure at work doesn't have to be the sole or the primary cause, as long as it's a contributing cause to the claimant's condition. That's right. And the point being that she failed to establish that she had the skin contact to the substances at work. Therefore, she failed to establish that she has a skin contact dermatitis due to things that she used at work, whereas it's clear that she has skin contact to things that she used in her personal life, the jewelry, the makeup, the eye drops, to which she was also allergic. So that's why I feel that the award in its entirety should be struck and reversed, because of the failure to prove the skin contact aspect that would be mandatory for a contact dermatitis case like this is. There's another issue. If the court finds that the petitioner claimant did have an occupational disease, then this claimant, Ms. Daly, she was off work for a year and three months, March 14th of 02 to June 24th of 03. Then she came back to work for the same employer. They put her to work at things to comply with a set of restrictions by Sheiman, because they wanted to get her back to work and give her a chance. They paid her the same wage. They had her to avoid any metal dust. Painting was not to be a problem, so they had her paint. They had her clean offices, because cleaning offices wouldn't be a problem, and they had her clean up the outside of the building. The claimant said she felt like she had a rash coming on, but she didn't go to the doctor. She didn't go to any doctor or have any outside observer to verify that she was resuming a rash. She did call Dr. Sheiman on the telephone on July 8th, and he said, well, I'll just boost your prescription of Eladil. Just take that, but he didn't take her off work, didn't recommend that she stop working. The claimant did stop working, however. Now, the arbitrator, in her decision that was adopted, believed that the petitioner was operating a press, an aerosol press when she returned to work in June and July of 2003. That was not true. If you read that passage carefully, it's at pages 54 and 55 of the arbitration transcript, C105 to C106 in the official numbering of the pages. It's obvious. The time when she operated the aerosol press for the last occasion was March 14th of 2002, and that's when she started to lose time. But when she returned to work, June 24th of 2003 to July 9th of 2003, she didn't operate the aerosol press again. She was accommodated in every possible way that Sheiman suggested, and yet the petitioner walked off the job. So the commission clearly had an error of fact on which they based the idea that the employer didn't accommodate, and they awarded the petitioner another year in prison. And that was clearly an error. The dissenting commissioner, Lindsay, pointed that out. And as an alternative to the first argument I gave, at least that portion of the award that granted maintenance from July 9th of 2003 to September 29th of 2004 should be reversed. And the permanent partial disability was based in part on the idea that the petitioner had to go out and get a job that paid less. Well, actually, she was working for the Postal Service as a relief mail carrier, and she made $17.51 an hour, which is actually more per hour than she'd been making for the U.S. Can Company. She had fewer hours per week, but she was on a list to be included. She only worked one day a week, right? On Saturday. Well, it turned out to be more than that. If you actually looked at the numbers of the numbers on the page stubs that she presented, she was actually making about $374 a week on the average. She was a relief carrier, which meant she'd work Saturday, and she'd also work when somebody else in that same post office was missing. So she had more than just one day a week. If somebody was sick. Somebody's sick, somebody's on vacation. There was no guarantee. Her only guaranteed work was the one day a week, is that right? At that particular time, yes, but her actual work was quite a bit more than that. It was more like, well, she was getting $17.51 an hour, and she was making $375 a week, so she was getting about 20 hours a week, give or take. She had no rash at the time of trial. She had no physical symptoms. She actually had no recurrences of the rash, except for one time when she used somebody else's shirt without laundering it, and she did get a rash on the abdomen, but it cleared up after 10 days. So she really doesn't have any permanent physical limitations that would prevent her from doing many or most occupations. Not even something that would logically prevent her from doing the modified work under any circumstances that the U.S. Can Company, in a very generous and cautious move, offered her. They were trying to find something to, you know, make sure that she'd be happy, content, and working. And they did. They made every effort. The petitioner claimant just walked off the job for no medical excuse, and... Well, let me just stop you there and ask this question. Can't the commission find on the maintenance issue they believe the claimant, she testified the symptoms were aggravated by the conditions of work upon her return, why can't the commission hang its head on that? Well, she said that she felt as if she were going to get a rash, that's all. She didn't actually have an outbreak, she didn't go to a doctor, she didn't have a medical excuse. Generally, a medical excuse in the form of a note from a doctor to say that this person needs to be off work from this particular time is required. Counsel, your time is up. You'll have time on rebuttal. Okay, thank you. Counsel, please. Might please the court. This is Fred Beer, attorney for Dawn Daly. First thing I would like to address is in the reply brief of U.S. CAM, they made an argument to the effect that the Sisbro case, the causative, the occupational activity only being a causative factor, did not apply to this case because the Sisbro case was not an Occupational Disease Act case. And I didn't, obviously I didn't get a chance to reply to that, so I'd just refer to one case, Bernardi v. Industrial Commission. It's a 362 Illinois Ave. 3rd, 582 3rd District, appellate court case, which did, those and other cases, did cite Sisbro in an occupational disease context, stating that, again, the occupational activity need not be the sole or principal causative factor as long as it is a causative factor. I think Counsel in the oral argument conceded that. Yeah, I think he conceded that. I think he did. So I just want to make sure it's clear for the record. And also, that same case said, I think there was also some interchange about you take your, the case talks about you take your employee with a preexisting condition as you find him or her, and if a preexisting condition is aggravated, that's also recoverable under the occupational argument, recognizing the law in that instance. And he seems to be saying, hey, this is not a case where the claimant's preexisting condition was aggravated, because this is contact dermatitis and there's no evidence anywhere that there could ever have been any contact. Therefore, they win the case because it was not a contributing factor and couldn't have been a contributing factor under the evidence in this case. What is your response to that argument? The response to that is, is that on the metal allergy, that there was not only metal shavings, there was metal dust. The testimony was all over the plant. And so even though she may not have physically touched metal because she had gloves on, but in regard to the nickel or metal exposure, it was via dust and metal shavings. In regard to the fragrant cleaning materials, she testified that they were very potent cleaning materials that she was working with. And obviously, if you have a fragrant, and her restrictions through Dr. Schuman were to, among other things, avoid these fragrant cleaning materials. So even though she didn't stick her hands in it, she was, obviously, if it's fragrant, it's going to come through vapors and whatnot. So there. He said she was trussed up like she had some hazmat suit on. She was protected against all of these exposures that you're alluding to. She didn't have a hazmat suit on. She did have a mask on and she had gloves and wore glasses, either prescription or protective eyeglasses, but still her arms and other areas of her face were exposed. And where was the dermatitis located? In her eyes, in her facial area, and in her, below the elbows, it spread. So it was typically, I think Dr. Schuman said it was, in his report, that it was consistent with the areas that she was exposed. And that's why he concluded, among other things, that one of the causes of her contact dermatitis was the exposure at the workplace to the metal and the fragrant cleaning material. So her entire face was not covered. No. And those areas of her face were exposed to the elements of the workplace, correct? That's correct. And those areas show the evidence of the dermatitis. That's correct. But you just used the word it spread. It spread. Well, something spreads because there's a contact of origin and then it spreads, right? Right. So what you're saying is for them to prevail, they need some evidence to show that the contact was where she was covered. Well, I mean, it spread and it got worse. Well, I'm just saying that if her eyes are covered, she's using eye makeup. Right. Okay. And the eye makeup they're contending is the cause. I see what you're saying. And then if it spreads, because it's down the cheek, doesn't mean that it's a contact with the cheek from environmental sources. Certainly that's an argument that the responder to U.S. CAN could make. I don't agree that that's what happened here, but that certainly is an argument. Because otherwise then there's no environmental contact. Right. And the U.S. CAN's liability, put in perspective. That's right. What about this last point that she walks off the job and she feels as though she's getting a ramp? Well, I think when she returned back to work in June, July 2003, she testified that they had her doing various things. One of the last things she was doing where she started to break out was she was cleaning supplies in the cafeteria, washing the walls. And she testified more than I started to break out again. On the record on pages 104 and 105 she talks about I started breaking out again. And later on page 105 she says, quote, then I broke out more. So it wasn't that I just felt like I was breaking out, but she broke out. And at the time they did pay her disability pay for another, I believe it was eight and a half months thereafter. And so they couldn't find a job for her, obviously, and that's why she went on the job search and all that stuff. So if she was off work, they're paying her disability pay eight and a half months thereafter. And by the way, the employer did get a credit for that off the TTD, which pursuant to stipulation, obviously, you know, she couldn't do the job. Because she didn't just walk off, they wouldn't just pay her. So it's our position that they admitted that she was disabled because they paid her for another eight and a half months after she came back. Well, the $33 paid extra to her, that just paid extra every month, and she doesn't have to account for it or anything. The medical part. Oh, the medical part, the future medical on that. I've never seen that, where she gets actually a dollar amount. Yeah, I didn't, obviously, I think that the evidence is consistent that she needs those cleaning materials, those special products to keep her condition under remission. But wouldn't the appropriate way to get that would be to ask for it after it's spent instead of getting it prospectively? That would be one, and medical is open, so certainly one appropriate way to be getting it is to come back to either the U.S. can or the court if necessary to ask for additional products. So, yeah, I wouldn't disagree with that. So you think that's in error? That she gave a specific dollar amount? No, but it's there for them to do it that way. I think in general, I mean, I think the arbitrators all the time do where in general they say that if someone needs additional treatment, that they're entitled to it. If the record discloses that there is a need like there isn't here, as to whether the specific dollar amount, the West testimony asked for the specific dollar amount. Again, I didn't appeal it. We thought that one of the appropriate ways that she could have done it was to give the specific dollar amount from, because actually the testimony was she was buying these products from April of 2002 to the date of the hearing of 2007, July of 2007, but obviously I didn't appeal that portion. But certainly I can understand if the ruling was a specific dollar amount forever, that may not be appropriate. I'd like to, I think a lot of these, her current condition, I think we've talked a lot of why we believe that her current condition was related to the occupational exposure. So I won't repeat all the other points we've made through the questions. One of the things I'd like to mention is that her, that obviously we have opinion testimony from Dr. Schuman as well as their doctor, Dr. Moyes, and he couldn't rule out the fact that occupational exposure to either metal or the cleaning materials were a causative factor. And in fact, he testifies, or in his reports, they say that he talks about, in Respondent's Exhibit 2, that it was possible that she was sensitized to nickel or cleaning materials, but it was difficult for him to determine which one of these was, which was the main cause of it. Part of the other record that shows this is a permanent severe exposure, as Dr. Schuman's report issues, is that in 2006 she had this, another event when she wore a shirt without washing it. It was a French shirt, and she had another reaction. So this is in 2006. And then also there was a testimony that she used a metal razor with metal blades, and now she uses, one of the products she uses is a razor with this special ointment, and she also had a breakout as a result of that. So although those aren't specifically related to an exposure she had at the workplace, obviously because we're talking this is years later, it does, it is relevant as to her long-term permanent nature and how severe it is because she's, you know, she's having these reactions years after the fact, after they first started. So that's, so that just goes to show that her, this isn't like a situation where she's had a minor contact dermatitis that stopped over three months and then it's never had a problem. She's kept it under remission because in part she's using all these special products. Do you agree with your opponent that she works about 20 hours a week with a postal service? I think 20 hours a week is high. I don't think there was a specific testimony. Certainly I agree that she works eight and a half hours a day guaranteed, and she fills in on occasion for the other postal carriers when they're on sick or vacation or that. But I think the arbitrator, I think the arbitrator was correct when she calculated it was about, at the time of the hearing she was earning about a third of what she earned at U.S. CAN. Okay. And as far as the 82 job change, 50% of loss of a person, I think that, again, that's not against the manifest way of the evidence. There's no, I don't think anybody's contesting that she can no longer do her janitorial job or aerosol press operator job. Dr. Sheeman opined that her restrictions were permanent. Again, we talked about the 2006 exposure or reaction showing this is long-term. She's kept her outbreaks under control using these products. She was off work for 131 weeks or two and a half years. And we talked about her earning capacity. And so, again, I think with all those, I did cite a couple of cases. This Hudson case, which was a co-exposure case where there was a ward of 60% of a person, 50% of a person, considering all these factors, I don't think is out of the range for an 82 job change claim. And then regarding the temporary total disability and disability payment and maintenance payments, we've kind of touched on that already, that when she came back to work, she did have this reaction, and certainly I agree with the interchange between counsel and the judge's report talking about there certainly is evidence, it's her own testimony, and the arbitrator and the commission that adopted the arbitrator's commission said that her testimony was uncontested, that when she came back she had these reactions. And as I pointed to the record, it wasn't just that she felt it coming on. It actually did come on that she had another reaction, and that she called her doctor and the doctor said just stay out of the environment, and I think she got some additional medication, took that, and again has kept it under control by using these special products. I think it's not against the manifest way to the evidence that the arbitrator granted her the temporary total disability and the maintenance for the reasons I've already said. She also did an extensive job search, the record showed, which would also support her claim for maintenance benefits, kind of a self-directed rehabilitation plan. She got a couple of jobs, and now she has a job at the time of the hearing, she had the job with the U.S. Postal Office. And then other than that, I think I can pretty much just rest on our brief. We already talked about the appropriateness of the future award for the special products, and the notice, I'll just make one last comment about the notice, since they brought that up in their brief. I think clearly that the U.S. can have notice, a couple of the doctors, this Dr. Maloney and Dr. Sheeman were interchanging with the employer back in 2002 and 2003. She notifies her supervisor November 13th, 2001, and she files her claim in June of 2002, and so I don't think there's any issue with notice.  Thank you, Your Honor. I think with regard to the time when the claimant did return to work in June 24th through July 10th of 2003, the testimony was at the bottom of page 53. Question, what type of reaction? Answer, I started breaking out again. The thing is, when this is coming on, I could almost feel it. It takes two days, but it starts out a little, it gets a little progressive. Next question is okay. Answer, so I called Dr. Sheeman. Question again is okay, and the answer is, and this is again the petitioner's testimony, claimant's testimony, Ms. Daly, and then he said, well, okay, then Mary Tanner would have me do something else. And finally, when I couldn't walk in the plant anymore, I was outside for three days sweeping the parking lot. So that's basically her description of what she was doing. She was outside sweeping the parking lot. She claimed she had a reaction, but she didn't go to Dr. Sheeman at all. I asked her that at page 119, and she said no, she didn't go to the doctor. And she never saw him after she returned to work on June 24th of 2003. She never saw Dr. Sheeman again. Never had any direct observation by Sheeman to show that she really was having a repeat breakout, and Sheeman didn't authorize her off work. He said just have Mary give you something else to do. Was there anything that would prohibit or preclude the commission from believing her and finding on that basis? Let's assume that she didn't see Sheeman. She testified as to this situation, this condition. Is that enough? I don't think it's enough, because she's got to have some certification of disabilities so that she can't be doing the work that's offered by the employer to require her to be on maintenance. And on maintenance, the purpose of maintenance is for the person who has reached maximum medical improvement to be looking for another job or rehabilitating themselves or being rehabilitated with cooperation of the respondent. So the prerequisite for being on maintenance is that you have to be disabled from continuing in the work that the employer has available for you. Well, did she pay her disability when she left? Well, she was paid a non-occupational disability under terms of a union contract, which is different from an admission of workers' compensation liability. And, indeed, under Section 8, payment of temporary disability would not be an admission of liability anyway, but it wasn't workers' compensation. It was a disability payment she had under a union contract. And she's entitled to that, and the 8J credit applies. We did have the contract terminology in the record, so it was proved that the 8J credit applies. The testimony of the petitioner was that the rash started around the eyes and then spread. This is going back to 2001. And she was using the eye makeup, so that explains why it started around the eyes. She was using the eye drops to which she had an allergy. That explains why it spread across the face. She was also using gold earrings, which kind of explains why it's on the side of the face and upper neck area. About the arms. Well, the doctor noted twice that she was wearing acrylic fingernails, to which she's got another substance that bothers her, and, you know, just incidentally scratching herself. There's the explanation.